In the Matter of the Estate of ELMER ELLSWORTH SMATHERS, Deceased.*

Surrogate's Court, Westchester County, September 28, 1934.

* See, also, 133 Misc. 812; 152 id. 774.

*Blake & Voorhees* [*Clinton H. Blake, Tracy S. Voorhees, Robert P. Smith, Edward I. Devlin, Jr.,* and *Daniel A. Dorsey* of counsel], for the executors.

*Choate, Larocque & Mitchell,* for the claimants Cornelia S. Seeds and others.

*Pugsley & Klein* [*Joseph Larocque, James B. Tucker, Paul M. Klein, Horace R. Lamb* and *William R. Sherwood* of counsel], for the Bank of America National Trust and Savings Association, as trustee.

*Clark & Jaeger,* for The St. Louis Union Trust Company, claimant.

*Arthur R. Wilcox,* special guardian.

SLATER, S.   Elmer Ellsworth Smathers died January 11, 1928, leaving a last will and testament admitted to probate in this court on the 14th day of February, 1928.   Letters testamentary were issued to the petitioners herein.

In this account of proceedings, among other questions to be determined is the validity of certain claims made against the estate by the trustee for holders of Broadway Properties Corporation of California first class mortgage six and one-half per cent sinking fund gold bonds aggregating $1,525,000, and by many of the individual bondholders of such issue.

By virtue of a trust indenture dated January 2, 1925, between Broadway Properties Corporation, a California corporation, and Hellman Commercial Trust and Savings Bank, a California institution, as trustee, certain property known as the New Orpheum Theatre property situated in the city of Los Angeles, Cal., was mortgaged by Broadway Properties Corporation to said trustee to secure an indebtedness of $1,750,000, evidenced by bonds. The bonds became due and payable January 2, 1944, unless sooner retired out of the sinking fund provided for in the trust indenture. Subsequently Hellman Commercial Trust and Savings Bank was succeeded by merger or consolidation and became known as the Bank of America National Trust and Savings Association, another California corporation, which latter bank has continued to act as successor trustee for the bondholders.

The decedent visited California in the winter of 1927 and while there became interested in the purchase of the New Orpheum Theatre property. The deed of the property is dated April 29, 1927, and the title was delivered in California on May 2, 1927, by the Broadway Properties Corporation conveying the real property to the decedent. At the time of the delivery and recording of the deed the decedent was in New York city. In this State persons or corporations usually buy and sell property through the terms of a written contract signed by the seller and the buyer. In California, however, they have what is called the " escrow system." The buyer states the terms of his offer to purchase; the seller states his proposal of sale, and, when the terms meet, or match, or mesh, it becomes a contract.

The executors offered in evidence copies of Mr. Smathers' escrow instructions to the Merchants National Trust and Savings Bank. They consist of a letter dated April 12, 1927, wherein a check for $900,000 is directed to be paid to the Broadway Properties Corporation " when you can procure for me a grant deed " conveying certain property described (known as the New Orpheum Theatre property on Broadway in Los Angeles). " Subject to the above mentioned easement for alley purposes, and the above mentioned agreement not to occupy the front five (5) feet.

" Said property to be free and clear, except the taxes for the fiscal year of 1927–28 now assessed, but not yet payable, assessments for street lighting.

" *The above described property is subject* to a deed of trust as set forth in that certain trust indenture dated January 2, 1925, by and between the Broadway Properties Corporation and the Hellman Commercial Trust and Savings Bank. The encumbrance to be $1,750,000, of which there has been paid of the principal, the sum of $25,000.

" For any additional instructions or waivers of any nature whatsoever, this is your authority to accept the signature of Joe Toplitzky."

It may be stated that Joe Toplitzky was the president of the Broadway Properties Corporation, and a real estate broker and dealer in the city of Los Angeles.

The only additional instruction or waiver received by the escrow holder came from Joe Toplitzky, for Smathers, under date of May 2, 1927 (the date of the delivery of the deed). It had to do with an easement for alley purposes. On this waiver or amended instructions is found the following acceptance:

" Amending our *instructions of April 25, 1927*, we will hand you grant deed and quitclaim deed in compliance with the above amended instructions.

"BROADWAY PROPERTIES CORPORATION,
" By (signed) JOE TOPLITZKY,
" *President.*"

The escrow instructions from the Broadway Properties Corporation are dated *April 25, 1927*, are signed by " Joe Toplitzky, Pres.," and state: " We will hand you grant deed executed by Broadway Properties Corporation to E. E. Smathers conveying the following described property:

(Here the property is described)

" *Subject to taxes of the fiscal year 1927–28. Trust indenture of record to secure bond issue of $1,750,000.*

" We will hand you bill of sale executed by Broadway Properties Corporation covering certain personal property in the New Orpheum Theatre Building.

" You are authorized to use the foregoing provided on or before fifteen (15) days from date you hold for our account the sum of $900,000.

" We will cause to be handed to you statement from the Trustee under the bond issue showing the unpaid principal amount of it to be $1,725,000."

The escrow instructions further provided for the prorating of interest on unpaid bonded indebtedness, insurance premiums, rents and the second half of taxes of 1926–27, and provided for a commission to Joe Toplitzky Company of $69,375.

This letter was the seller's only escrow instructions. Both escrow letters plainly state that the buyer takes *subject* to the mortgage bonds.

There is now found in the escrow envelope a resolution passed by the directors of the Broadway Properties Corporation *April 21, 1927*, resolving to sell the property to the decedent in consideration

of the payment of $1,000,000, and " in consideration of the agreement by said E. E. Smathers to pay all bonds secured by, and the *assumption* by said E. E. Smathers of all of the terms and conditions of " the mortgage.

The letter of instructions is materially at variance with the resolution. No proof was offered that the resolution was any part of the escrow instructions, or was received by the escrow holder, at the time of the delivery of the deed. In fact, in the recent transmission letter dated June 22, 1934 (which is in evidence), inclosing a photostatic copy of the escrow instructions from Broadway Properties Corporation to Merchants National Trust and Savings Bank, to which the Bank of America National Trust and Savings Association is successor, the assistant trust officer says: " The escrow *instructions do not require* assumption of mortgage by Smathers as part of the consideration, but we *hold in our files* a resolution passed by the Board of Directors * * * which provides for the sale of the property to him upon the payment of one million dollars and the *assumption* of the outstanding bonds." Suffice it to state the court was not enlightened as to when or how it was placed in the files. The strong inference is that it was not there as a part of the escrow instructions.

The letter of instructions from the Broadway Properties Corporation and the letter of instructions from Mr. Smathers, both directed to the escrow holder, match in that the proposal to sell and the letter to buy cause Smathers to take the property *subject* to the mortgage indebtedness.

It appears that the predecessor of the Bank of America National Trust and Savings Association in the city of Los Angeles, the present trustee for the bondholders (the mortgage to secure them having been made before decedent ever visited Los Angeles), was also the escrow agent for the buyer and the seller. The buyer Smathers was in New York city when the deed was delivered. The proof fails to show that he was represented by an attorney at the closing of the title. On the closing of the title the bank, the escrow agent, accepted a deed on *May 2, 1927,* which contained a mortgage *assumption* clause. The deed was recorded at eight-thirty A. M. on the morning of May 3, 1927.

Shortly after May 3, 1927, presumably May 7, 1927, the decedent caused to be delivered in California to the Broadway Properties Corporation a writing which, according to the claimants, in part formed the basis of the alleged liability of the estate. It reads as follows:

" In consideration of the execution by Broadway Properties Corporation, a corporation, of a grant deed covering certain real

property in the city of Los Angeles, county of Los Angeles, state of California, described in that certain mortgage or deed of trust recorded in Book 4828, at Page 258 of the official records of said county, I hereby agree to pay certain bonds in the principal amount of one million seven hundred twenty-five thousand dollars ($1,725,000), secured by said mortgage or deed of trust, and hereby assume all of the terms and conditions thereof.

" In witness whereof, I have subscribed my name hereto this *3d* day of *May*, 1927.  " E. E. SMATHERS."

The paper was acknowledged in the county of New York · on *May 3, 1927*, where decedent was at that time, after the title was closed, the money paid and the deed recorded.

The decedent in his lifetime operated the property through " Joe Toplitzky Co.," real estate dealers and rental agents in Los Angeles. Smathers paid the taxes, the interest on the mortgage, and the amortized amounts. In January, 1928, he died a resident of Westchester county, N. Y., where his will was probated.

On March 15, 1928, Ray L. Erb, one of the executors named in decedent's will, was appointed executor of the estate of · the decedent in California by the Superior Court of the county of Los Angeles. He qualified and has since acted as such executor. From the date of his appointment and up to December 31, 1932, the California executor paid to the trustee under the trust indenture amounts on account of the graduated sinking fund of the semi-annual installments of interest. It is claimed by the executor that there was no valid assumption contract, and that such sums were paid to protect the equity in the property.

On March 17, 1928, the California executor published a notice to creditors to file claims within a designated period of ten months. Within the required period no claims, actual or contingent, were filed by claimants (that is, the bondholders' trustee, or by the holders or owners of any of the bonds) with the California executor or with the clerk of the Superior Court of the State of California in the county of Los Angeles, the court having jurisdiction of the administration of the estate in California.

On August 29, 1931, Joe Toplitzky took from his box of confidential papers as referred to in his letter to Smathers of May 7, 1927, the assumption agreement, and sent a copy of it to the trust department of the Bank of America National Trust and Savings Association, the present trustee for the bondholders. Was this the first time it was released to the light of day?

On December 8, 1932, an agreement was entered into by Broadway Properties Corporation, Ray L. Erb, as executor in the State

of California, and by the executors in New York, including said Erb, known as the "rescission agreement," to rescind all agreements of the decedent, if any, with respect to the assumption upon the aforesaid bond in conformity to California law. Pursuant to said agreement, the Broadway Properties Corporation agreed to repurchase the title to the New Orpheum Theatre property in California from the estate for value, subject to the approval of the Superior Court of Los Angeles. Subsequently, and on the 23d of December, 1932, the Superior Court made an order authorizing and confirming the sale of said property according to the terms of said contract, after an appraisal was made by direction of the court. The official appraisal was $1,525,776.45. On the 30th day of December, 1932, said property and all articles of personal property used in connection therewith were conveyed by the decedent's California executor to the Broadway Properties Corporation for $1,000 consideration.

At such time, December, 1932, the executors herein paid to the Broadway Properties Corporation $75,000 as a consideration for the rescission agreement and release of all contracts and assumption agreements (if any ever existed) between said corporation and Smathers.

The bondholders' trustee did not, nor did the holders of any of the bonds, attempt to enforce an assumption agreement, if any, made by the decedent, prior to December 8, 1932, the date upon which said agreement was rescinded.

The original mortgage was $1,750,000 and was amortized to $1,525,000 at the date of the rescission agreement. A vast amount of testimony was given by expert witnesses brought on from Los Angeles as to the present value of the theatre property. If there is a claim, it is contingent. In California the only enforcible obligation of the maker of a note secured by mortgage or trust deed is the obligation to pay the deficiency. (*Bank of Italy, etc., Assn.* v. *Bentley*, [1933] 217 Cal. 644; 20 P. [2d] 940.) The mortgage is being foreclosed at the present time but, under the emergency laws of California, a sale cannot be had until the spring of 1935. The security must first be exhausted. (Cal. Code Civ. Proc. § 726.)

The testimony of expert witnesses for the claimants as to the value is not satisfying. The testimony of two qualified real estate witnesses of the city of Los Angeles, testifying for the estate, said that the present value was about $1,550,000. The theatre property has been assessed at $838,950, and, throwing official light upon the value of the property at the present time, it appears that section 11 of chapter 642 of the California Public Laws of 1931 makes a determination of the ratio of the assessed value to

the true value. The table of ratio of the assessed value to the true value gives Los Angeles county $40.82, assessed value against the true value, causing the official value to be over $2,000,000.

The claims of claimants were filed in the office of the Surrogate's Court of Westchester county from April, 1933, through to March, 1934.

It is the contention of the claimants that the law of New York governs all questions arising affecting the contract, the validity and construction of any assumption agreements,. and the rescission agreement of December 8, 1932; that the effect of the rescission agreement which purported· to discharge and rescind obligations created by the New York law must be determined by the New York law; that the rescission agreement was ineffective because the purchasing bondholders had acquired knowledge of the Smathers agreement to pay bonds and had relied on such knowledge either in purchasing or in continuing to hold their bonds, and that the rescission agreement was a transaction in fraud of creditors.

The petitioning executors contend that the California law governs all questions of the substantive rights of the parties; that the executors are under no liability to the claimants; that in any event the claims are unenforcible since prior to their enforcement any contract forming the basis of the claims had been legally rescinded pursuant to the law of California; that if the claims ever existed they are definitely barred by the provisions in the California Statute of Limitations; that the failure of the claimants to file their claims against the estate with the California executor or the clerk of the court within the statutory period fixed precludes the claimants or any bondholders from enforcing any claims or maintaining any action against the estate either in California or in New York.

The deed of trust securing the bonds was executed in California in 1925 and was on California property, issued by a California corporation to a California State bank as trustee. The mortgage bonds were issued at the same time in California, secured by California property and payable in California. The deed to Smathers was delivered to and accepted by the escrow agent for Smathers in California. The contract, if any, was made to be performed in California. The general rule is that a contract made in one State to be performed there is governed by the law of that State; that a defense or discharge, good by the law of the place where the contract is made or to be performed, is to be held, in most cases, of equal validity elsewhere.

A review of all the papers and letters in evidence written and executed before the closing of the title on May 2, 1927, and shortly thereafter, produces the inescapable conclusion that the insertion of

the assumption agreement in the deed to Smathers was made without authority and without the knowledge and consent of Smathers.

In any event, such assumption clause, if any, is no part of the grant. It is personal in its nature, and not relating to the land. For such assumption clause to be enforcible there must be a meeting of the minds of the grantor and the grantee. It is unnecessary for the court to state who is responsible for the insertion of such assumption clause in the deed. It is clearly apparent.

The evidence shows that the decedent never had the deed in his personal possession, never read the deed and never knew of the inclusion of an assumption clause in the deed; that his secretary placed it in Smathers' safe deposit box where it remained and was found after his death.

Where a claim is made upon the theory of ratification, the person sought to be held must be shown to have had full knowledge of all the facts and, if the grantee's knowledge is partial, or imperfect, he cannot be said to have ratified the unauthorized act. The rule that a purchaser must be held to have notice of everything that appears on the face of the deeds under which he buys does not apply to a mortgage assumption clause, which is, properly speaking, no part of the grant. (*Merritt* v. *Bissell*, 155 N. Y. 396; *Blass* v. *Terry*, 156 id. 122; *Fishback* v. *Forkner Fig Gardens, Inc.*, [4th App. Div. Cal., March 6, 1934] 30 P. [2d] 586, which adopts with full reference the principle of law set forth in *Blass* v. *Terry, supra; Pope* v. *Hoyt*, 200 App. Div. 475, 477; 47 Harvard Law Review, p. 1065, April, 1934.)

The rule thus stated finds support in numerous cases in many States. These cases also are authority for concluding that there was no ratification; that the estate is not estopped from asserting that Smathers did not make the alleged agreement; that there is no merit in the argument that Smathers should have commenced an action for revocation of the deed; that the rule that a purchaser must be held to have notice of everything which appears on the face of the deed under which he buys, does not apply to a mortgage assumption clause which is no part of the grant. In the absence of such proof the claimants cannot prevail on the theory of ratification.

The burden of proving a valid agreement by Smathers to pay the debt of another was upon the claimants. The only proof produced was the record of the deed containing the assumption clause, but this clause did not prove a personal promise or obligation on the part of Smathers, in the absence of proof that he actually accepted the deed with knowledge of the assumption

clause. Like all other personal contracts, it must be shown by paper itself or otherwise that there was a meeting of minds and mutual assent of the parties. When a deed of land contains a provision binding the grantee to become personally responsible for the payment of a pre-existing mortgage, the holder of the mortgage claiming benefit of the promise made for the benefit of a third party, must prove something more than the mere fact that the deed was recorded. Such proof in the instant case has not been forthcoming. There could be no ratification by Smathers until he had knowledge of the clause in the deed and its legal effect as a promise upon his part. The claimants must show that Smathers agreed to pay through some act of his own, or that of his agent duly authorized in connection with the purchase of the property.

The assumption clause is wholly ineffective as between the parties to the instrument, and the owners of the mortgage bonds have no greater right to enforce the assumption than do the grantors. (*Drury* v. *Hayden*, 111 U. S. 223; *Arnstein* v. *Bernstein*, 127 App. Div. 550; *Union Trust Co. of Rochester* v. *Allen*, [1934] 239 id. 661.)

It is clear that Smathers never had communicated to him the directors' resolution; knew nothing about an assumption agreement to be placed in the deed, and never in his lifetime knew that it was in the deed. He was imposed upon by Toplitzky and his escrow agent, the bank, when it accepted in his behalf the deed containing an assumption agreement. The successor bank is in court as a litigant without clean hands.

The title was closed, the deed delivered and recorded before ever a telegram was sent by Smathers, or received by Toplitzky, telling him that the assumption agreement of May third had been executed. The document of May 3, 1927, was no part of the escrow agreement resulting in the delivery of the deed to the property on May 2, 1927. It stands on its own footing.

I hold that the escrow instructions consist of decedent's letter or proposal dated April 12, 1927, and the Broadway Properties Corporation's letter or acceptance dated April 25, 1927, the terms of which letters matched and made the one complete contract (*Tuso* v. *Green*, 194 Cal. 574, 581; 229 P. 327, opinion by Chief Justice MYERS, one of the experts who testified on this trial); that the decedent never became bound in contract to assume the bond issue; that the escrow contract did not contain an assumption agreement; that the escrow instructions were violated by the bank whose successor is now claiming against the estate; that the agreement, if any, was entered into in the State of California where it

was to be performed, and that the law of California governs the rights of the parties as to its construction and validity. (*Benton* v. *Safe Deposit Bank*, [1931] 255 N. Y. 260; *Pritchard* v. *Norton*, 106 U. S. 124.) The obligation (if any) was entered into in view of the laws of California. (*Union Nat. Bank* v. *Chapman*, 169 N. Y. 538; *Goetschius* v. *Brightman*, 245 id. 186.)

If it is said that the directors' resolution is a part of the seller's escrow instructions, it must be held that such proposal did not match, or mesh, with the instruction of the buyer. Consequently, under California law, no contract was entered into and no assumption agreement was undertaken by Smathers.

As to the agreement of May 3, 1927, Toplitzky was the president of the Broadway Properties Corporation and personally interested and personally conducted the negotiations leading up to the sale. Toplitzky had his company directors pass a resolution on *April 21, 1927*, agreeing to sell the property with an *assumption clause* to be in the deed; on behalf of the Broadway Properties Corporation, of which he is president, he signed the escrow agreement of April 25, 1927, making it *subject* to the trust mortgage. On *April 28, 1927*, he personally wrote Smathers in New York city a letter on " Joe Toplitzky Co." letterhead, probably received four days later, on May third, in which he said: " I am enclosing a form for your signature which is to be acknowledged. * * * This relates to the present bond issue against the New Orpheum Building property which is being purchased by you. Will you please execute this and return at your early convenience. Please wire me after you have received the form and signed it, so that we may complete our records here for closing the escrow." · This is signed " Joe Toplitzky."

In reply to this letter and after the title had been closed, and on May 3, 1927, Smathers executed the paper, mailed it, and wired that the paper was executed. The original telegram was sent from New York after two P. M. of May 3, 1927, and arrived in Los Angeles about noon, Los Angeles time. This is plain proof that the deed had not only been delivered, but had been recorded prior to any communication from the decedent about the agreement of May third.

In the letter of May 3, 1927, from Smathers to Joe Toplitzky, addressing him as " Dear Joe," Smathers asks, " It is necessary for me to guarantee payment of these bonds? " His question evidences the fact that the receipt of Toplitzky's letter was the first Smathers had heard of any guaranty to be made by him. Toplitzky replied under date of May 7, 1927, stating with reference to the guaranty: " The only purpose of this guarantee is that

it is necessary on account of a ruling by the Corporation Commissioner in the State of California. * * * However, it is strictly a confidential affair. The People who hold the bonds do not know that such an instrument exists, nor do many of the stockholders who sold the property. It lays in the files of the Broadway Properties Corporation, which, for a long time to come at least, will be in my personal possession, as I am going to keep all the papers pertaining to the Broadway Properties Corporation in my office so we can have them for future records in event they are needed." This letter is signed " Joe."

The agreement was personal in its nature and application between Smathers and Toplitzky, or between Smathers and the Broadway Properties Corporation. The deed was not delivered in reliance upon any assumption agreement by Smathers. It could not have been.

" It is not every promise made by one to another, from the performance of which a benefit may ensue to a third which gives a right of action to such third person. * * *. The contract must be made for his benefit as its object, and he must be the party intended to be benefited." (*Simson* v. *Brown*, 68 N. Y. 355, 361; *Van Clief & Sons, Inc.*, v. *City of New York*, 141 Misc. 216, 219.)

It is settled law that the consideration for a unilateral contract must be present and that a prior act which imposed no legal obligation at the time it was performed is no consideration and will support no promise whatever, or, as the rule has been stated otherwise, an executed consideration is no consideration for any promise other than that which the law would imply. (13 C. J. 359; *Pershall* v. *Elliott*, 249 N. Y. 183, 188; Williston Cont. § 142; *Slocum* v. *Whittic*, [1930] 228 App. Div. 874.)

I hold the assumption agreement of May third, so called, does not constitute an enforcible contract obligation by the claimants. If enforcible, its terms would be controlled and its interpretation would be under the law of California. The claimants have no valid claim against the estate upon any assumption agreement, be it in the deed, or as claimed under the letters and telegrams of May 3, 1927.

But, as other issues, which logically follow those heretofore decided, have been tried at length, this decision will proceed to discuss and decide them on the theory that the claimants at one time had rights, either growing out of the deed of the property, or of the letter and telegram of May 3, 1927. The issues, taken in order, first relate to the rescission agreement. Was it valid?

Expert opinion evidence relating to the law of California with regard to the rescission agreement of December 8, 1932, takes up

a large part of the record of the case. California is the one State in the Union that has a statutory law providing for the rescission of a contract. The Civil Code of California (Subd. 3, part 2, tit. 5, chap. 2) relates to the rescission of contracts. Section 1688 provides: " A contract is extinguished by its rescission." Section 1689 provides that " a party to a contract may rescind the same in the following cases only: * * * [setting forth four types of cases]. 5. By consent of all the other parties." (*Bank of Alameda County* v. *Hering*, 134 Cal. App. 570; 25 P. [2d] 1004.)

We have no such law in New York, nor is there such a law in the other States. But, as Judge CARDOZO said in *Loucks* v. *Standard Oil Co.* (224 N. Y. 99, 111): " We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise." The law of rescission in California armed the executors with a legal method to avoid the assumption agreements, if any every existed. If that be a fault, the California Legislature must be blamed.

The claimants rely for their rights upon several equitable doctrines. The claimants' answer raises the issues: (1) That the bondholders had acquired definite contract rights prior to such rescission and that such rights could not be in any way affected by the rescission agreement; (2) that there was some element of estoppel against the executors; (3) that no valid rescission agreement was ever entered into because the Broadway Properties Corporation was not in existence; (4) that the claim was invalid as to the bondholders because it was a fraudulent device, the result of conspiracy to deprive them of their contract rights against the Smathers estate; (5) that the company was insolvent; (6) that under the doctrine of equitable subrogation the original parties to an assumption agreement of a mortgage could not rescind such agreement as against the mortgagee where the mortgagor was insolvent; (7) that the rescission agreement was invalid because the cancellation of the assumption was a surrender of a right which constituted a transfer in fraud of creditors; (8) that on the theory of third party beneficiary the claimants had rights to be enforced.

Much testimony was taken by deposition in California and on the trial offered in evidence with regard to the reliance by claimants and estoppel arising thereunder in the purchase of, or the continued holding of the bonds, on the faith of the assumption agreements, which testimony the court did not admit in evidence as to reliance on the ground that it was hearsay. The record is devoid of proof that the claimants in the purchase of the bonds relied upon any statement made by Smathers. The principle of estoppel is not present.

Evidence was given by the parties representing the estate at the time of the rescission agreement with regard to the facts, the care used, legal opinions secured from counsel to be assured that the estate was securing a legal rescission.

The law of California is that, when real property is conveyed, subject to an existing incumbrance to a grantee who assumes the incumbrance, the holder of such incumbrance may enforce such promise of the grantee by direct action against him. This rule of law is predicated upon the legal rule expressed in section 1559 of Civil Code of California, which says: " A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

Another rule is based upon the equitable doctrine that a creditor is entitled to the benefit of all securities given by his debtor to one who has become surety of such debtor for the payment of the debt. This doctrine has been codified in section 2854 of the California Civil Code. The ruling case on these equitable principles, as well as the right of rescission of contracts, is *Biddel* v. *Brizzolara* (64 Cal. 354; 30 P. 609), which holds that the right of a mortgagee for a deficiency against a subsequent purchaser does not result from any *fixed or vested right* in the mortgagee arising either from the acceptance of the conveyance, or from his *obligation to pay* the mortgage debt as between himself and his grantor; that the mortgagee can only be entitled to be subrogated to an existing remedy of his debtor, the mortgagor, upon a legal *existing* stipulation; that the mortgagee has no greater or other equity in himself and is entitled only to such remedy as the mortgagor himself had, and that the original parties to the contract *may rescind* and extinguish it and, after such rescission and extinguishment, the contract becomes incapable of enforcement.

Subsequent cases have followed the rule of law set forth in the *Biddel* case, as follows: *Alvord* v. *Spring Valley G. Company* (106 Cal. 547; 40 P. 27); *Flint* v. *Cadenasso* (64 Cal. 83; 28 P. 62); *Thomson* v. *Bettens* (94 Cal. 82; 29 P. 336); *Case* v. *Egan* (57 Cal. App. 453; 207 P. 388); *Washer* v. *Independent M. & D. Co.* (142 Cal. 702; 76 P. 654); *More* v. *Hutchinson* (187 Cal. 623; 203 P. 97); *Bogart* v. *Porter Co.* (193 Cal. 197; 223 P. 959). The *Biddel* case was cited with approval and followed by the California Supreme Court in *Williams* v. *Naftzger* ([1894] 103 Cal. 438; 37 P. 411), and in *Cunningham* v. *Robinson* ([1925] 196 Cal. 672, 675; 239 P. 313, wherein the court said: " The decision of this court in the above-cited case * * * has not since in anywise been departed from or modified)." These cases support the expert testimony of former Chief Justice MYERS and former Supreme Court Judge SLOSS.

In *Lundeen Corp.* v. *Barlow* ([1932] 120 Cal. App. 391; 7 P. [2d] 1102) the court held that a third party beneficiary could not enforce a contract made for his benefit after it had been *rescinded* by the original parties. To the same effect is *Stanton* v. *Carnahan* (15 Cal. App. 527, 530; 115 P. 339.)

The expert legal evidence of the former chief justice of the State of California, the Hon. LOUIS W. MYERS, and by former Supreme Court justice, the Hon. MARCUS C. SLOSS, presented by the executors, supported by California law, is to the effect that there was an absolute right under California law on the part of the original parties to terminate the agreement at any time prior to the institution of suit by the third party claiming equitable rights, and that prior thereto the third party had no right of any nature, except the conditional privilege of bringing action which might be ripened into a right only by starting legal action, or its equivalent, filing the claim against the estate before the agreement was rescinded. No equitable right, upon any theory, survives the termination of the right of the debtor. (*Biddel* v. *Brizzolara, supra.*) It was the opinion of the legal expert witnesses on California law, and it appears to be the California law, that the claim of a mortgagee under an assumption agreement where there has yet been no default and where the due date of the principal has not yet occurred at the time within which to file claims, is contingent under California law. (*Barthe* v. *Rogers*, 127 Cal. 52; 59 P. 310; *Estate of Hincheon*, 159 Cal. 755; 116 P. 47; *Reed* v. *Reed*, 178 Cal. 187; 172 P. 600.)

Claimant's contention that the Broadway Properties Corporation was not legally in existence was abandoned upon the trial.

The record contains statements of counsel and evidence with regard to the restatement of the law of contracts by the American Law Institute. So far as the law is restated with regard to the legal issues here involved, the restatement is at variance with the law of California. The law as to the rescission must be decided according to the law of California, which is not the law that the writers of the restatement of the law of contracts would have the States of the Union accept. Such restatement of the law has never been accepted by the California courts, nor by the Legislature of that State.

As to the legal element of insolvency in the contention that insolvency prohibits rescission, and that fraud entered into the rescission agreement: The California law is that, where there is a valuable consideration, even though not a consideration of comparable value to the right given up, insolvency alone is not sufficient to permit a creditor to invalidate the rescission transaction; that there is no

presumption of law as to fraud from insolvency alone, but that actual fraud must be proved as a fact; that fraudulent intent is one of fact and not of law. (Cal. Civ. Code, § 3442; *Denehy* v. *Stewart*, [1919] 41 Cal. App. 88; 181 P. 839; *Windhaus* v. *Bootz*, [1891] 92 Cal. 617; 28 P. 557; *Atkinson* v. *Western D. Syndicate*, [1915] 170 Cal. 503; 150 P. 360; *Byerley* v. *Conlin*, 174 Cal. 40; 161 P. 1150.) There is no evidence that the executors or their counsel had any notice of insolvency. While there is no charge of actual fraud, there is a charge of fraud in law.

As to the validity of a transfer asserted to be in fraud of creditors: To attack the transfer as one in fraud of creditors, a judgment against the debtor is necessary before the claim can be asserted. Section 3441 of the California Civil Code is the bar. (*Bickerstaff* v. *Doub*, 19 Cal. 109; *Denehy* v. *Stewart, supra.*) This must be determined by California law. None of the claimants are judgment creditors of the Broadway Properties Corporation. A judgment is the basis of such a claim.

The court holds that the contention of claimants that the rescission agreement constituted a fraudulent device to deprive the bondholders of their rights against the estate is without force; that, in entering into the rescission agreement, there was no actual fraud, nor intent to defraud, nor fraud in law proved against the executors of decedent's estate, or counsel representing them; that the rescission was supported by a valuable consideration of $75,000. It sold a claim of uncertain value, or of no value this court has heretofore found, for the valuable consideration of $75,000. The burden of showing that the rescission was made with fraudulent intent was upon the claimants and was not sustained. There was no disproportion of the price paid to the value of any possible contingent claim of claimants, except that the executors overpaid in view of opinions by experts of realty values, and in further view of the fact that no legal assumption agreement was ever entered into. The legal expert, Judge MYERS, testified that in his opinion the reconveyance accompanied by cancellation of the assumption agreement would constitute a " double barreled rescission."

The right to seek a rescission agreement was accorded by the laws of the State of California and I hold that it was legally performed.

Are the claimants barred by the California Statute of Limitations, and, if so, further barred by the laws of New York?

On March 17, 1928, the California executor published notice to creditors to file claims, pursuant to section 707 of the California Probate Code (former section 1491-a of the California Code of Civil Procedure), which provides that all claims arising upon

contract, whether they are due, not due, or *contingent*, must be filed or presented within the time limited in the notice, or as extended by the provisions of section 702 of this Code; and any claim not so filed or presented is barred forever, unless it is made to appear that claimant had not received notice by reason of being out of the State, in which event it may be filed or presented any time before a decree to distribute is rendered. Publication for claims as required by law provided for filing within the ten months' period prescribed.

It is admitted that no claims were filed within the prescribed time, nor at any time up to the date of the rescission agreement in December, 1932. It is contended by claimants that section 707 of the California Probate Code was not a *general* statute of limitations, and, even if they were barred against the California executor and the California assets, they are not barred against the New York executors, or the New York assets.

It was held in *Morrow* v. *Barker* (119 Cal. 65, 66; 51 P. 12), in referring to former section 1493, now section 707 of the Probate Code, that it was " a statute of limitations " and that it is " imperative." The court said with reference to the law: " Here is a statute of limitations. The holder of no claim is excepted from its disability, saving him alone who has been absent from the state. A court is not authorized to make an exception to relieve from hardship or to aid apparent equities." (*Tynan* v. *Walker*, 35 Cal. 634; *Sichel* v. *Carrillo*, 42 id. 493.) As was said in *Estate of Hildebrandt* (92 Cal. 433, 436; 28 P. 486): " The statute is imperative and applies to all claims arising upon contracts. If the effect of it is to cause a loss or work a wrong in some particular case, that is a matter for the consideration of the legislature, and not the courts."

This section is a statutory bar to claims of any nature which might have existed on the part of the corporation, or the bondholders, against the decedent's estate, except possibly as against the claim of persons outside of California, who might not have had actual notice of the proceedings in the estate there. (*Barthe* v. *Rogers*, *supra; Estate of Hincheon*, *supra*, 760, opinion by Judge SLOSS, an expert witness in the instant case.)

Section 13 of the New York Civil Practice Act declares the policy of our law by providing that " where a cause of action arises outside of this state, an action cannot be brought in a court of this state to enforce such cause of action after the expiration of the time limited by the laws of a state or country where the cause of action arose, for bringing an action upon such cause of action, except where the cause of action originally accrued in favor of a resident of this state." Our courts have held that the cause of action arises in the place where the contract is made and to be performed.

(*Wester* v. *Casein Co. of America*, 206 N. Y. 506; *Laurencelle* v. *Laurencelle*, 217 App. Div. 159.) The cause of action herein, if any, arose in California, and the nature and validity and legal effect of the same is to be determined by the laws of that State. Under the laws of California the Statute of Limitations applies regarding the commencement of a cause of action, and the Statute of Limitations of that State has run against the claimants.

I hold that an action or proceeding cannot be maintained in the courts of this State by reason of the provisions of section 13 of the New York Civil Practice Act barring the prosecution of an action where a statute has run against it in the State where the cause of action originated. (*Klotz* v. *Angle*, 220 N. Y. 347; *National Surety Co.* v. *Ruffin*, 242 id. 413; *Kirsch* v. *Lubin*, 131 Misc. 700; affd., 248 N. Y. 645; *Kahn* v. *Commercial Union of America, Inc.*, 227 App. Div. 82; *Balee* v. *Hidalgo County Water Imp. District No. 4*, [1930] 229 id. 660; *Walz* v. *Mansfield*, 144 Misc. 304, 306.)

The executors charge laches on the part of the claimants, and their counsel plead excuses. The real claimant here is the trustee bank for all bondholders. The bank cannot well deny notice of rescission since December, 1932. Still no claim was filed here by the trustee until March, 1934. In these distressed times I would rather believe that the trustee did not know just what to do in the matter. The completeness of the defense of the executors on the substance of the claims makes it unnecessary for the court to pass upon the question of laches and ratification by claimants.

The claims of the trustee for the bondholders, and of each individual bondholder appearing filing claims, the court holds, are without merit in law, or in fact, and that the estate is under no liability to them. The claims are dismissed on the merits.

Submit order on notice to attorneys appearing.